**FEDERAL FARM CREDIT BANKS FUNDING CORPORATION,
Plaintiff,**

v.

**FARM CREDIT
ADMINISTRATION, Defendant.**

**Civ. A. No. 89–1427–A.**

United States District Court,
E.D. Virginia,
Alexandria Division.

Feb. 26, 1990.

Lee H. Pelton, Mac Asbill, Jr., Warren N. Davis, Robert W. Clark and Steuart H. Thomsen, Sutherland, Asbill & Brennan, Washington, D.C., for plaintiff.

Stuart M. Gerson, Asst. Atty. Gen., Theodore C. Hirt, Tracy L. Merritt and Raphael O. Gomez, Dept. of Justice, Civ. Div., Washington, D.C., Henry E. Hudson, U.S. Atty., E.D.Va., Alexandria, Va., and Richard Cohn, Farm Credit Admin., McLean, Va., for defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

HILTON, District Judge.

This is a proceeding under the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 500–706 (1988), in which plaintiff Federal Farm Credit Banks Funding Corporation ("Funding Corporation") challenges certain actions of defendant Farm Credit Administration ("FCA"), an agency of the federal government.

The Funding Corporation contends that the FCA acted unlawfully in issuing its Accounting Bulletin 89–2, which purportedly interpreted generally accepted accounting principles ("GAAP") and in subsequently interpreting and applying the Bulletin to the Farm Credit Insurance Fund ("Insurance Fund" or "Fund"). The FCA determined that the Fund may not be included as an asset in combined financial statements of the Farm Credit System ("System"), and that premiums payable by System Banks to the Fund must be treated as a System expense even though they remain available to ensure System debt obligations. The Funding Corporation also challenges FCA's determination that the Accounting Bulletin precludes disclosing to investors the amount of the Insurance Fund.

## FINDINGS OF FACT

1. The Farm Credit System is a nationwide network of federally chartered banks ("System Banks") and associations that provide credit to the agricultural sector of this country.

2. Plaintiff Federal Farm Credit Banks Funding Corporation is a federally chartered institution of the system.

3. System institutions are regulated by Defendant FCA, an agency of the United States.

4. System Banks and associations either make loans directly to borrowers or make loans to other institutions, which in turn lend to borrowers. System Banks and associations are cooperatively owned, either directly or indirectly, by their respective borrowers. Each System Bank has its own board of directors and management and are not commonly controlled or managed.

5. The Funding Corporation is responsible for issuing and marketing debt securities ("Systemwide debt securities") on behalf of the System Banks which own the outstanding stock of the Funding Corporation and elect seven of the nine members of its board of directors.

6. System Banks obtain funds for their lending operations primarily from the sale of Systemwide debt securities by the Funding Corporation. Systemwide debt securities are the joint and several liabilities of the System Banks and are not obligations of, nor are they guaranteed by, the United States or any agency or instrumentality thereof, other than System Banks. System associations obtain their funds for lending operations primarily by borrowing from System Banks.

7. The Insurance Fund provides protection to investors in Systemwide debt securities. When the Insurance Fund becomes fully operational, the Insurance Corporation must exhaust all the assets of the Insurance Fund to avoid a default to investors before FCA may call upon any System institution to honor the joint and several liability provisions of the Farm Credit Act.

8. The Funding Corporation prepares and issues the financial disclosure and reporting for System institutions on a combined basis (the "Combined System Financial Reporting") based upon information provided to it by the System Banks. The Combined System Financial Reporting is prepared and issued primarily for the benefit of investors in Systemwide debt securities. Annual and quarterly information statements and press releases contain combined financial statements, discussions and analysis of the System's financial condition and results of operations, and other disclosure.

9. The *Annual Information Statement* includes a financial report audited by the System's independent accountants, presently Price Waterhouse. This audited financial report is accompanied by a letter from Price Waterhouse as to whether, in its opinion, the audited report fairly presents the System's financial position in conformity with GAAP.

10. "GAAP" is defined by FCA's own regulations as "that body of conventions, rules, and procedures ... *promulgated by the Financial Accounting Standards Board and other authoritative sources recognized as setting standards for the accounting profession in the United States.*"

11. The Farm Credit System Insurance Corporation (the "Insurance Corporation") and the Insurance Fund were established by amendments to the Farm Credit Act made in the Agricultural Credit Act of 1987, Pub.L. No. 100–233, 101 Stat. 1568 (enacted Jan. 6, 1988), as amended (the "1987 Act"). The Insurance Corporation is managed by a board of directors, consisting of the FCA Board, which has a fiduciary and statutory obligation to comply with the provisions of the 1987 Act. 12 U.S.C. § 2277a–2 (1988). The Insurance Fund is held and administered by the Insurance Corporation for the uses specified by the Act.

12. The Farm Credit Act limits the uses of the Fund as set out in 12 U.S.C. § 2277a–9(c) (1988). The statutorily prescribed uses of the Fund are all uses that directly or indirectly benefit System institutions.

13. In January 1989, approximately $260 million from a pre-existing revolving fund administered by FCA was transferred to the Insurance Fund. Premiums paid by System Banks and associations and the income earned through the investments by the Corporation of assets in the Insurance Fund will continue to fund the Insurance Fund. The premiums due from the System Banks beginning in 1990 are expected to amount to approximately $80 million per year. The estimated balance of the Fund

as of November 14, 1989 was more than $317 million.

14. The Insurance Fund will grow through premiums and earnings. It is expected that the Fund's total assets will eventually reach about one billion dollars, an amount approximately equal to one-third of the permanent capital and surplus of the entire System as of September 30, 1989. The non-protected capital stock (*i.e.,* stock the redemption of which is not guaranteed by the Act) and surplus of the system of June 30, 1989 was approximately $3 billion.

15. After a review of the 1987 Act and the accounting issues raised by it, Price Waterhouse, the System's independent accountants, prepared a report in March 1988 concluding that, under GAAP, the Combined System Financial Reporting should reflect the Insurance Fund as a "restricted" System asset, and not as an expense.

16. In May 1988, FCA was notified of the Funding Corporation's intended accounting treatment of its Insurance Fund. In February 1989, the System requested that FCA provide information on the amount of money transferred into the Insurance Fund so that this information could be reflected in Combined Financial Reporting, and FCA supplied the necessary information. The System's *Annual Information Statement—1988,* dated March 1, 1989, copies of which were provided to FCA, indicated that in future periods the Insurance Fund would be included in the Combined System Financial Reporting.

17. In May 1989, the System's *Quarterly Information Statement* and press release, prepared by the Funding Corporation for the first quarter of 1989, treated the Insurance Fund as a restricted asset (of $259,799,000) in the Combined System Financial Reporting. The first quarter of 1989 was the first reporting period during which there were monies in the Insurance Fund.

18. On July 6, 1989, Michael J. Powers, Director of FCA's Office of Financial Analysis, issued a letter (the "July 6, 1989 Letter") to all System institutions' chief executive officers enclosing Accounting Bulletin 89–2. The Letter and Bulletin were issued without notice to the parties affected, without any opportunity for comment, without seeking or obtaining the authorization of the FCA Board, and without permitting Congressional review.

19. Accounting Bulletin 89–2 states, *inter alia,* that "the Insurance Fund assets are not to be represented as Farm Credit institution assets in ... the Farm Credit institutions' combined report to investors and Annual and Quarterly Information Statements" and that premiums paid by System Banks to the Insurance Fund should be treated as an expense in the Combined System Financial Reporting. The Bulletin states that the Insurance Fund does not meet the essential characteristics of an asset as defined by GAAP in order to be included as an asset of the System.

20. Accounting Bulletin 89–2 was intended to be mandatory and FCA was prepared to institute enforcement proceedings if it were not complied with.

21. Shortly after receipt of Accounting Bulletin 89–2, Mr. Bienz requested a meeting with FCA to discuss the matter. Mr. Bienz and John Marsh, Vice President, Accounting and Financial Reporting of the Farm Credit Corporation of America ("FCAA"), met with Tom Dalton and Jim Thies of FCA's accounting staff on July 20, 1989. During the meeting, Mr. Bienz inquired as to the effect of not following the Accounting Bulletin. The FCA representatives advised that it would be the same as violating FCA regulations, and that FCA could issue a cease and desist order to the Funding Corporation.

22. In a letter to FCA dated July 28, 1989, the Funding Corporation explained in detail its disagreement with the July 6, 1989 Letter and Accounting Bulletin 89–2. Enclosed with this letter were a July 28, 1989 memorandum prepared by Messrs. Marsh and Bienz, a July 28, 1989 Price Waterhouse opinion, and a July 27, 1989 opinion of Sutherland, Asbill & Brennan, the Funding Corporation's counsel.

23. The July 28, 1989 letter from Price Waterhouse reflected Price Waterhouse's further consideration of the matter and an explanation that the appropriate treatment under GAAP was to include the Insurance Fund as a restricted asset in the Combined System Financial Reporting.

24. Mr. Powers shortly thereafter reaffirmed FCA's position, and in the same letter, Mr. Powers recognized the significance to readers of the Combined System Financial Reporting of how the Insurance Fund is reported, asserting that "representing FCSIC assets of the combined Farm Credit institutions could seriously misrepresent System financial."

25. On August 9, 1989, Robert G. Williams, Senior Vice President, Financial Management Division of FCCA, confirmed by letter a telephone conversation of the same date with Mr. Powers with respect to the FCA position as to the propriety of either (a) including the Insurance Fund as a restricted asset in the Combined System Financial Reporting or (b) disclosing information about the Insurance Fund in footnotes to such financial statements.

26. The administrative record, certified by FCA, reflects no effort by Mr. Powers to alter or clarify the position reflected in the August 9, 1989 letter.

27. Mr. Powers interpreted paragraph 2 of the August 9, 1989 letter (issued after the Administrative Record was certified) as simply indicating that FCA would not provide quarterly balance information, but not purporting to preclude footnote disclosure of balance information.

28. The Funding Corporation prepared the financial statements in the *Quarterly Information Statement* for the second quarter of 1989, issued in August 1989, in accordance with Accounting Bulletin 89-2. Moreover, this indicated that the financial results previously reported for the first quarter would have been different had they been presented in accordance with the requirements of the Accounting Bulletin. The Funding Corporation also indicated its disagreement with FCA and that it was making further efforts to obtain relief from compliance with the Accounting Bulletin.

29. In an August 30, 1989 letter, Price Waterhouse confirmed its view that GAAP requires the inclusion of Insurance Fund as a restricted System asset; Price Waterhouse further stated that failure to do so would result in its issuing a "qualified opinion" stating that the combined financial statements for 1989 reflected a material departure from GAAP, if the amount involved were material.

30. By letter of September 1, 1989, the Funding Corporation sought a meeting of the parties and their professional advisers to discuss the accounting issues further, and enclosed the letter of August 30, 1989, from Price Waterhouse.

31. At the request of the Funding Corporation, Professor Davidson, together with representatives of Price Waterhouse, the Funding Corporation and FCCA, met with FCA officials, including Mr. Powers, on September 21, 1989.

32. System representatives suggested at the September 21 meeting that if there was a disagreement about the application of GAAP and other technical accounting issues, it might be preferable to submit the dispute to a panel of accounting experts for arbitration and that the System would agree to be bound by the determination of such a panel.

33. Issuers of securities strive to publish financial statements in accordance with GAAP. However, if the Funding Corporation issues 1989 year-end Combined System Financial Reporting statements in compliance with Accounting Bulletin 89-2, Price Waterhouse, the System's independent auditors, will issue an opinion stating that the financial statements reflect a material departure from GAAP.

34. Compliance with Accounting Bulletin 89-2 will result in 1989 year-end combined System financial statements accompanied by a qualified opinion, reported earning approximately $80 million less, and reported system assets and capital several hundred million dollars less. Each of these three changes may cause investors to view the System's financial condition as materi-

ally less favorable than would otherwise be the case.

35. Even if full disclosure of the Insurance Fund—including the amount and composition of the balance and any expenditures—could be made in a footnote (and it is not clear that FCA will provide enough timely information for this to be done), such information could at best persuade an investor or potential investor who studied and analyzed all such information that the financial position of the System was the same as it would appear to be in a financial report not subject to the requirements of Accounting Bulletin 89–2.

36. It is clear that on balance the financial report dictated by Accounting Bulletin 89–2 will result in a more negative perception of the System's financial position by investors or potential investors, a perception likely to lead to higher costs of funds to the System.

37. Because of a concern that failure to comply with GAAP casts doubt upon the credibility of an entity's financial reporting, issuers of securities and financial statements place a high priority on publishing financial statements in accordance with GAAP. For this reason, qualified opinions are rare.

38. The System is harmed by being forced to publish financials accompanied by a qualified opinion, without regard to whether there is any clear market impact or how accurately any economic impact can be measured.

## CONCLUSIONS OF LAW

This action is brought under 5 U.S.C. §§ 702, 703 and 28 U.S.C. § 2201 to obtain declaratory relief.

This court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331. Venue is proper in this court under 28 U.S.C. § 1391(b) and (e).

The defendant challenges plaintiff's standing to bring this action by arguing that the Funding Corporation is not the real party in interest. The Funding Corporation prepares and issues the Combined System Financial Reporting which is at is-

sue in this suit, and is ordered to comply with FCA's orders concerning Combined System Financial Reporting. Thus, plaintiff is directly affected by regulation. *Planned Parenthood of Central Missouri v. Danforth*, 428 U.S. 52, 62, 96 S.Ct. 2831, 2837, 49 L.Ed.2d 788 (1976). In addition, an association has standing to bring suit on behalf of its members to challenge agency actions affecting its members. *Hunt v. Washington State Apple Advertising Comm'n*, 432 U.S. 333, 343, 97 S.Ct. 2434, 2441, 53 L.Ed.2d 383 (1977). The plaintiff and members it represents are directly affected by the regulation in question and plaintiff has standing to bring this action.

Defendant also argues that plaintiff's injuries are too speculative and too remote. However, the agency is requiring the System to modify its Combined System Financial Reporting in a manner that significantly reduces the reported amount of its assets and earnings. The Funding Corporation will have to employ an accounting treatment that will lead to the issuance of a "qualified" opinion on the Combined System Financial Reporting, thwarting its objective of publishing financial statements which reflect no material departure from GAAP. The requirement changes disclosure to the System's investors of the amount and uses of a very substantial Insurance Fund that was established by Congress to benefit the System and its investors. Such changes will likely lead to higher costs of funds for System lending operations. Such injury, present or threatened, is sufficient to establish standing. *Los Angeles v. Lyons*, 461 U.S. 95, 101, 103 S.Ct. 1660, 1664, 75 L.Ed.2d 675 (1983) ("personal stake in the outcome" is the essence of the Article III standing requirement); *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379, 102 S.Ct. 1114, 1124, 71 L.Ed.2d 214 (1982) (an organization has been injured for Article III purposes if its practices and activities have been "perceptibly impaired"); *Sierra Club v. Morton*, 405 U.S. 727, 734, 92 S.Ct. 1361, 1366, 31 L.Ed.2d 636 (1972); *National Collegiate Athletic Ass'n v. Califano*, 622 F.2d 1382, 1389 (10th Cir.1980). *See also Gladstone,*

*Realtors v. Village of Bellwood,* 441 U.S. 91, 99, 99 S.Ct. 1601, 1607, 60 L.Ed.2d 66 (1979); *Motor Coach Indus., Inc. v. Dole,* 725 F.2d 958, 963 (4th Cir.1984); *In re Grand Jury Proceedings,* 625 F.2d 1106, 1108 (3rd Cir.1980), *cert. denied,* 454 U.S. 1098, 102 S.Ct. 671, 70 L.Ed.2d 639 (1981).

■ Defendant FCA argues further that the Funding Corporation's claims are not ripe for review, because FCA alleges an injury will occur at some indefinite point in the future. The purpose of the ripeness doctrine in the case of review of administrative action is to avoid judicial interference "until an administrative decision has been formalized." *Abbott Laboratories v. Gardner,* 387 U.S. 136, 148–49, 87 S.Ct. 1507, 1515–16, 18 L.Ed.2d 681 (1967). Before this court is a final agency action within the meaning of the APA, and the issues presented thus are ripe for review. *Id.; see also Gardner v. Toilet Goods Ass'n,* 387 U.S. 167, 87 S.Ct. 1526, 18 L.Ed.2d 704 (1967). The agency has taken final action and has required the plaintiff to follow the requirements it has set forth.

■ As to the issuance of the Bulletin 89–2, the APA requires agencies prior to the promulgation of a rule to afford notice of proposed rulemaking and an opportunity for public comment. 5 U.S.C. § 553 (1988). These procedures are commonly referred to as "informal rulemaking" under the APA, as opposed to the "formal rulemaking" procedures of APA sections 556 and 557, which require that a formal agency hearing be conducted. *See id.* §§ 553(b), (c), 556, 557. An exemption from these notice and public comment procedures for informal rulemaking exists for interpretative rules, general statements of policy, or rules of policy, or procedure, or practice. *Id.* § 553(b)(3)(A). Interpretative rules simply state what the administrative agency thinks the statute means, and only remind affected parties of existing duties. In contrast, a substantive or legislative rule, pursuant to properly delegated authority, has the force of law, and creates new law or imposes new rights or duties. *Jerri's Ceramic Arts, Inc., v. Consumer Product*

*Safety Comm'n,* 874 F.2d 205, 207 (4th Cir.1989).

■ FCA's argument that its action constitute interpretative rulemaking and is exempt from the notice and comment requirements of 5 U.S.C. § 553 lacks merit. Where an interpretation attempts to define a standard established by authorities outside the agency and has the force and effect of a substantive rule, the court will look beyond the agency's characterization of its own action and require that notice and comment procedures be observed. *See Jerri's Ceramic Arts,* 874 F.2d at 207–08; *Tabb Lakes, Ltd. v. United States,* 715 F.Supp. 726, 728–29 (E.D.Va.1988). Accounting Bulletin 89–2 purports to interpret generally accepted accounting principles ("GAAP"). GAAP is a compilation of standards developed by the accounting profession. FCA's own regulations recognize that GAAP is that body of conventions, rules, and procedures promulgated by the Financial Accounting Standards Board and other authoritative sources recognized as setting standards for the accounting profession in the United States. 12 C.F.R. § 621.2(a)(9) (1989). The definitive interpretation of GAAP is not entrusted to FCA, which possesses no unique expertise in accounting, but rather to the accounting profession. An agency action which does not clarify or explain the relevant phrase of an underlying regulation, but instead defines criteria for the proper accounting treatment, is a substantive rule and not an interpretive rule. *Washington Fed. Sav. and Loan Ass'n v. Federal Home Loan Bank Bd.,* 526 F.Supp. 343, 382–83 (N.D. Ohio 1981). FCA's action defines criteria for the proper accounting treatment and sets standards for GAAP different from those previously used.

FCA's actions were intended to, and clearly do, have the force of law, by requiring System institutions to cease, effective immediately, certain accounting practices and to follow certain new accounting practices. FCA indicated that its rule would have the effect of a regulation and could be enforced through FCA's regulatory enforcement powers. Thus, the actions un-

der review in this case are substantive rules and do not fit within the narrow exceptions to the notice and comment requirements intended by Congress under 5 U.S.C. § 553(b). *American Hosp. Ass'n v. Bowen,* 834 F.2d 1037, 1044 (D.C.Cir.1987); *National Ass'n of Home Health Agencies v. Schweiker,* 690 F.2d 932, 949 (D.C.Cir. 1982), *cert. denied,* 459 U.S. 1205, 103 S.Ct. 1193, 75 L.Ed.2d 438 (1983).

In this case, the impact is substantial because the action is retroactive, works a change in existing law, and engenders practical difficulties in compliance. *See Spartanburg Gen, Hosp. v. Heckler,* 607 F.Supp. 635, 644 (D.S.C.1985). The size of the asset in question—a Fund valued at over $317,000,000, which is expected to grow to approximately $1 billion through interest on investments and through annual premiums of $80,000,000—demonstrates that the impact on plaintiff Funding Corporation is significant. Where agency action has such substantial impact on the affected parties, the notice and comment procedures of section 553 are appropriate regardless of whether the agency characterizes its action as interpretative. *Jerri's Ceramic Arts,* 874 F.2d at 208. FCA's failure to follow notice and comment procedures requires reversal of FCA action.

The Farm Credit Act requires that any FCA rule or regulation must be approved by the FCA Board. 12 U.S.C. § 2243 (1988). The regulations also provide that the Board must prescribe rules and regulations. 12 C.F.R. § 600.3(b) (1989). FCA's internal operating procedures in effect during the relevant period precluded any delegation of authority to FCA staff to establish general policy and promulgate rules and regulations. FCA Order No. 888, 54 Fed.Reg. 7881 (Feb. 23, 1989).

FCA acknowledges that the decision here at issue was never submitted to or acted on by the Board. Because failure to seek Board review and approval was plainly improper, *see* 12 U.S.C. § 2243(1) (1988), FCA's actions were without observance of procedure required by law and thus invalid under the APA. 5 U.S.C. § 706(2)(D) (1988).

FCA's attempt to characterize its action as an interpretative rule does not cure the deficiencies of its procedure under the Farm Credit Act and FCA regulations, which do not distinguish, for the purpose of Board approval, between interpretative rules and substantive rules. *See* 12 U.S.C. § 2243(1) (1988); 12 C.F.R. § 600.3(b) (1989).

For the reasons set forth above, judgment shall be entered in favor of plaintiff Funding Corporation, and the Accounting Bulletin 89–2, its cover letter dated July 6, 1989, and FCA's final determination of November 13, 1989, are set aside and may be further considered by the defendant in accordance with the Administrative Procedures Act and Farm Credit Act regulations.

An appropriate order shall issue.