**RESIDUAL ASSOCIATES, LLC, Plaintiff,**

v.

**The UNITED STATES, Defendant.**

**No. 98–99L.**

United States Court of Federal Claims.

June 20, 2000.

---

John W. Horsley, Salt Lake City, Utah, for plaintiff.

Thomas L. Halkowski, U.S. Department of Justice, Washington, D.C., with whom were Assistant Attorney General Lois Schiffer, U.S. Department of Justice, Washington, D.C., and Christopher B. Rich, Regional Solicitor's Office, Department of the Interior, Salt Lake City, Utah, for defendant.

## OPINION

BRUGGINK, Judge.

This is an action asserting a taking pursuant to the Fifth Amendment to the Constitution. Plaintiff Residual Associates, LLC ("Residual") owns several hundred acres of mountainous Utah land containing deposits of gold, silver, and other minerals. It brings this action asserting that the United States Bureau of Land Management ("BLM") and the Bureau of Reclamation ("BOR"), by undertaking a large scale dam and reservoir project bordering plaintiff's land, effectively destroyed plaintiff's ability to use various easements needed to access its mineral deposits. These circumstances have been the subject of a prior decision of this court. *See Park City Consolidated Mines Co. v. United States,* No. 94–188L, slip op. (Fed.Cl. Nov. 5, 1996) ("*Park City*").

Pending are cross-motions for summary judgment. Oral argument was heard at the conclusion of initial briefing. At the conclusion of oral argument, the court ordered supplemental briefing, which is now complete. Further argument is deemed unnecessary. For the reasons set out below, plaintiff's motion for summary judgment is denied, and defendant's motion for summary judgment is granted.

## FACTUAL BACKGROUND

Plaintiff is a successor in interest to Park City Consolidated Mining Company ("Park City"), having become the owner of the subject property and associated takings claim as the result of a corporate dissolution in 1998. Park City and its predecessors in interest will be referred to collectively herein as "plaintiff" or Residual. Plaintiff's property consists of an approximately 815 acre tract located in the mountains of Summit and Wasatch Counties, Utah. Plaintiff operated a silver mine on this tract until the beginning of World War II. The mine has remained inactive ever since.

In 1951, plaintiff sought access to undeveloped portions of its mineral deposits by commencing efforts to develop a horizontal tunnel, in hopes that such a tunnel would allow it to extract minerals without resort to the costly vertical shaft extraction method previously used. In connection with these efforts, plaintiff acquired two easements from the Fisher family, which owned a ranch adjacent to the plaintiff's tract. The first Fisher easement was a surface easement conveying the exclusive right to use of a five-acre tract for mining purposes only, and, subject to certain limitations, the right to vary the tract's location. For purposes of this opinion, the court will accept that plaintiff's ability to locate its five-acre surface easement and the accompanying tunnel entrance at any one of a number of different locations within specified boundaries on the Fisher Ranch makes the Fisher surface easement a "floating easement."

The second Fisher easement, referred to as the "tunneling easement," granted plaintiff the right to construct an underground mining tunnel to run westerly toward plaintiff's mineral deposits from a portal within the five-acre surface tract. This easement also granted the right to vary the course of the tunnel "should caving ground or other conditions require."

Along with the Fisher easements, plaintiff took steps in 1987 to reinforce and extend its rights by filing a tunnel site location with the BLM. *See* 30 U.S.C. § 27 (1994) ("Tunnel Site Act"). The parties refer to this filing as

the Gordon–Stott tunnel claim. The tunnel site filing identified the Gordon–Stott tunnel as having a portal at a location on the Fisher surface easement. This was the same origination point described for the tunnel in the original Fisher easement agreement. The Gordon–Stott tunnel claim and the Fisher tunneling easement essentially contemplate construction of the same tunnel. According to their respective documentary descriptions, both tunnels would follow the same course to reach plaintiff's mineral deposits. As a legal matter, however, the Gordon–Stott claim was essential to plaintiff's access to its mineral deposits because the proposed Fisher tunnel site was bisected by land owned by Union Pacific Railroad Company. The railroad obtained this land from the Fisher family pursuant to a quitclaim deed in 1923. Plaintiff concedes that its rights under the Fisher tunneling easement alone would not have been sufficient to permit tunneling under the railroad, but points out that because the mineral estate in the railroad's land had been reserved to the United States, the proposed tunnel could be constructed by relying on the federally protected tunneling interest embodied in the Gordon–Stott tunnel claim.

According to plaintiff, it suffered a taking due to the BOR's Jordanelle Project, which was begun in the 1970s and completed in 1993. The Jordanelle Project involved construction of a 3000–acre reservoir along the Provo River. Plaintiff's land, including its mineral deposits, lies approximately 4400 feet west of the reservoir. There is a mountain between the reservoir and the mineral deposits. The reservoir basin itself does not include any of plaintiff's mineral deposits; both the Fisher easements and the Gordon–Stott tunnel site, however, are located within the border of the reservoir basin's management boundary. This means that in addition to complying with all relevant state, local, and federal regulations, plaintiff was required to obtain permission from BLM before commencing construction of an access tunnel within the reservoir basin's management boundary.

Shortly after plaintiff executed the filings required for creation of the Gordon–Stott tunnel claim in January 1987, plaintiff's prin-

cipals reached the conclusion that various aspects of the Jordanelle Project would make it impossible for it effectively to utilize the Fisher surface easement and the Fisher/Gordon–Stott tunnel easement to access its mineral deposits. They feared that overflow from the reservoir would result in periodic flooding of the Fisher surface easement, thus hindering access to any tunnel entrance. Residual was also concerned that if it reactivated its old mine to extract its undeveloped mineral deposits, water would gradually seep from the reservoir through subsurface fissures and eventually flood plaintiff's mine. Additionally, there was concern because the BOR, as part of the Jordanelle project, had acquired title to the Fisher Ranch. After it acquired title, the BOR granted three new easements across the Fisher property between 1990 and 1993. The first was for a public hiking trail. The second and third were public utility easements; one for an underground natural gas transmission line, and the other for above-ground electrical power lines. The utility easements bisected the area of the Fisher property that plaintiff had planned to use as its tunnel route. Residual's principals believed that the presence of the competing easements prevented the company from completing an access tunnel.

They also believed that the presence of the public hiking trail would hamper efforts to obtain the necessary approvals from the BOR. This fear was strengthened by the language of the BOR's Final Supplement to the Final Environmental Statement ("FSFES") for the Jordanelle Project, issued in 1987. The FSFES indicated that the reservoir management boundary would be "fenced to exclude livestock and private development." It also stated that BOR intended to acquire sufficient land surrounding the reservoir lakefront to "provide a visual corridor free of private development around the lake shoreline." Residual took these statements as evidence that BOR and BLM would never grant the necessary approvals for creating an access portal on the Fisher surface easement and constructing a tunnel along the Fisher/Gordon–Stott tunnel route.

By the fall of 1987, Residual commenced efforts to seek compensation from the BOR

for the perceived interference with its access rights resulting from the Jordanelle Project. In an October 14, 1987 letter to the BOR, it offered to sell the Fisher easements. Residual suggested that BOR purchase the easements in order to avoid future litigation over BOR's potential liability for anticipated interference with their use. BOR initially responded that the issue of compensation for Residual's easements would best be dealt with at a later time. In 1991, BOR informed Residual that its Realty Specialist had examined the company's Fisher easements, and concluded for various reasons that they did not convey valid subsurface tunneling rights. The BOR indicated that it would not purchase Residual's easements or otherwise compensate it for any alleged interference caused by the Jordanelle Project or the government's grant of the hiking trial and utility easements across the Fisher property. On May 6, 1993, the BOR sent a letter officially denying Residual's request for compensation.

This dispute has been the subject of two prior lawsuits, one in district court and an earlier one in this court. Plaintiff initially filed suit against the United States in district court in Utah on August 6, 1993. In that action, plaintiff took exception to various aspects of the BOR's response, and in particular to the agency's insistence that the Fisher surface easement, even if valid, did not fall within the projected high-water line for the reservoir's management boundary area. It sought a declaration under the Quiet Title Act, 28 U.S.C. § 2409a (1994), that the Fisher easements conveyed valid subsurface tunneling rights and that plaintiff was permitted to shift the five-acre surface easement to whatever portion of the Fisher property would offer optimal access to plaintiff's adjacent mineral deposits. Plaintiff also sought compensation for a Fifth Amendment taking, arguing that the various interferences caused by BOR's Jordanelle project had effectively deprived it of all economically beneficial use of its access easements and its undeveloped mineral deposits.

The government moved to dismiss for lack of subject matter jurisdiction. It argued that this court had exclusive jurisdiction over plaintiff's takings claims, and that the Quiet Title Act was inapplicable because the United States was not claiming a property interest adverse to plaintiff's interest in the access easements. In support of its position concerning the Quiet Title Act, the government submitted a declaration disclaiming any interest in plaintiff's claims for the Fisher easements and the Gordon–Stott tunnel site.

The district court dismissed, finding that plaintiff's takings claims properly belonged here. The court also dismissed plaintiff's quiet title action, accepting the government's declaration disclaiming all interest in plaintiff's surface and tunneling easements. Plaintiff then re-filed its Fifth Amendment takings claims in this court on March 21, 1994. The complaint contained three claims: a physical taking of plaintiff's property (Count I); a regulatory taking of plaintiff's property (Count II); and a denial of due process (Count III). The Government filed a motion for summary judgment on Count I, a motion to dismiss Count II for failure to state a claim, and a motion to dismiss Count III for lack of subject matter jurisdiction.

The case was assigned to Judge Wiese. In his opinion, Judge Wiese assumed, for purposes of evaluating the government's defenses, that plaintiff's property interests in the Fisher surface easement and the Fisher/Gordon–Stott tunneling easements were valid. *See Park City,* slip op. at 10. Judge Wiese granted defendant summary judgment as to Count I, finding that the plaintiff had not presented any evidence to support its claim of a physical taking. *See Park City,* Slip op. at 19. He dismissed Count II, the regulatory taking claim, because plaintiff had failed to demonstrate that the Jordanelle Project would interfere with plaintiff's ability to access its mineral deposits. *See id.* at 10. Defendant had submitted affidavits from BOR officials indicating that the agency was willing to work with plaintiff on developing a plan that would allow it to use its access easements to create the tunnel that plaintiff needed in order to exploit its mineral deposits. *See id.* at 11. Despite plaintiff's assertions that the BOR was determined to bar all development within the reservoir management area, the court found that submission of a mining plan would not be futile. *See id.* at

12. Because plaintiff had not submitted a mining plan, it was not possible to determine if the Jordanelle Project would be implemented in such a way as to cause a regulatory taking. The claim was thus premature. *See id.* at 10–12. Finally, the court dismissed plaintiff's due process claims for lack of subject matter jurisdiction. *See id.* at 20. The dismissal was not appealed.

Although it does not feature in the *Park City* decision, plaintiff's interest in the Gordon–Stott tunnel site had lapsed earlier in 1996. This was a result of its failure to file the annual affidavits and pay the annual fees required under the Federal Land and Policy Management Act of 1976 ("FLPMA"). *See* 43 U.S.C. § 1714 (1994).

On February 6, 1998, plaintiff filed the pending action. The current complaint contains two claims. The first alleges a physical taking based on either of two phenomena: the easements for utilities and for a ·public hiking trail, and the alleged inevitable flooding that would occur due to overflow from the reservoir. In addition, plaintiff asserts a regulatory taking claim, arguing that "Defendant exercised its regulatory authority in ways that deprived the owner of all economic use of the Fisher Portal Tract, the Fisher Tunnel, and the Gordon–Stott Tunnel Claim." Based on plaintiff's counsel's representations in oral argument and on extensive post-argument briefing, it is clear that this latter argument is based on events occurring no later than 1993. Based on the discussion in *Park City*, it is clear that both these claims were present in the prior complaint.

In November 1998, Residual submitted a proposed mining plan to BLM. BLM rejected the plan in a March 3, 1999, decision letter. The bases for the rejection were that the Gordon–Stott tunnel site was no longer valid, and that the Fisher tunneling easement was insufficient by itself to allow plaintiff to access its mineral deposits. An earlier draft of BLM's decision, dated January 13, 1999, also informed Residual that if a court later determined it had the right to conduct mining operations on the Fisher surface easement, BLM would need to work with the agency to correct inadequacies in Residual's proposed mining plan in preparation for the required Environmental Assessment of the proposal.

On July 2, 1999, defendant moved for summary judgment. Plaintiff filed a cross-motion for summary judgment on August 26, 1999. The parties dispute a number of legal issues and asserted facts, including the validity of plaintiff's title to the Fisher easements and the Gordon–Stott tunnel site at the time of the alleged takings, and, the extent to which the government's actions actually deprived plaintiff of economically viable use of its property. These disputes do not preclude consideration of the defendant's motion for summary judgment, however. This is because, in its briefing and at oral argument, plaintiff has made it clear that it is alleging a taking based on events occurring prior to the lapse of its interest in the Gordon–Stott tunnel site in 1996. Thus the core issue in dispute is the extent to which plaintiff's claims are barred by this court's earlier opinion in *Park City*.

### DISCUSSION

Plaintiff's supplemental brief of April 3, 2000, provides three theories of liability, along with dates for each:

> Plaintiff's contentions are that its operating easements were the subject of a temporary regulatory taking that began October 14, 1987 and continued until May 6, 1993; that the regulatory taking became permanent on that latter date; and that the physical intrusions upon and into the easements in 1993 resulted in a physical taking.

*See* Supp. to Pl.'s Brief in Response to Def.'s Supp. Memo. at 1. All of these theories were raised in *Park City*, which was issued in November, 1996. It is also worth noting in this respect that plaintiff concedes that its interest in the Gordon–Stott tunnel site lapsed in September 1996. Any taking claimed with respect to that tunnel easement, must therefore, of necessity, have taken place prior to such lapse.

The apparent identity between the present set of claims and those previously asserted prompted the court to press plaintiff's counsel at oral argument for additional details

regarding both its physical and regulatory taking theories, in an effort to determine whether the same claims were being advanced, and to confirm allegations as to the dates of alleged takings. As to the former, in one of its supplemental briefs, Residual wrote that:

The agency actions that brought about the temporary regulatory taking in this case are stated in the Bureau's final environmental statement, and in its letter dated May 16, 1993... The Bureau denied the request [for compensation] by letter dated October 14, 1987....

The Bureau denied the request by letter dated May [16], 1993...

The physical intrusions became permanent in April 1993 when the filling of the Jordanelle Dam's actual structure started and thereby settled its location. That action also settled the boundary of the State Park and the public uses of the Jordanelle Trail and the Park land.

Plaintiff's Brief of April 3, 2000 at 2–3 (citations omitted).

These references, as well as the text of Judge Wiese's opinion, demonstrate that the facts plaintiff is relying on to establish its current claims are essentially the same as those presented in the earlier litigation. This prompts the inquiry, why isn't the present action barred by principles of *res judicata* or collateral estoppel?

■ The related doctrines of *res judicata* (claim preclusion) and collateral estoppel (issue preclusion) foreclose relitigation of claims or issues that have been decided on the merits in other suits.[1] *See Montana v. United States*, 440 U.S. 147, 153–54, 99 S.Ct. 970, 59 L.Ed.2d 210 (1979) (summarizing applicable law and discussing rationale for enforcement of *res judicata* and collateral estoppel). Claim preclusion bars further litigation by parties or their privies of the same cause of action after final judgment on the merits. *See id.* The bar applies not only to those theories actually litigated, but to all claims arising out of the same facts and circum-

stances which could have been simultaneously litigated. *See Mars Inc. v. Nippon Conlux Kabushiki–Kaisha*, 58 F.3d 616, 619 (Fed.Cir.1995) ("[A] party must raise in a single lawsuit all the grounds of recovery arising from a single transaction or series of transactions that can be brought together") (citations omitted); *Vitaline Corp. v. General Mills Inc.*, 891 F.2d 273, 274–75 (Fed.Cir. 1989) (same).

■ Under issue preclusion, once an issue is actually and necessarily determined by a court of competent jurisdiction, that determination is conclusive in subsequent suits based on a different cause of action involving a party to the prior litigation. *See Montana*, 440 U.S. at 153, 99 S.Ct. 970; *see also Arkla, Inc. v. United States*, 37 F.3d 621, 623 (Fed. Cir.1994). Issue preclusion is only applicable where (1) the issue to be decided is identical to one decided in the first action; (2) the issue was actually litigated in the first action; (3) resolution of the issue was essential to a final judgment in the first action; and (4) the parties had a full and fair opportunity to litigate the issue in the first action. *See Arkla, Inc.*, 37 F.3d at 623–24.

■ Plaintiff insists that the *Park City* opinion held only that its claims were premature, and thus that any discussion in *Park City* regarding the merits of its taking claims is dictum. During oral argument plaintiff's counsel urged the court to adopt the view that *Park City* held either that the court did not have jurisdiction to consider plaintiff's taking claims, or that plaintiff had not yet established adequate title to its operating easements because it had not submitted a proposed mining plan to the BOR. Plaintiff's characterizations, however, are not accurate. While *Park City* did hold that plaintiff's claims were premature, this is not, as plaintiff would have it, the equivalent of holding that the court lacked jurisdiction or that title to the easements had not been established. Instead, the court held that plaintiff's claims

---

1. Because *res judicata* can sometimes be used to refer to any preclusion of litigation arising from a previous judgment, the Federal Circuit has, for the sake of clarity, adopted the use of the terms "issue preclusion" and "claim preclusion." *See Foster v. Hallco Manufacturing*, 947 F.2d 469, 478 (Fed.Cir.1991).

were premature because a compensable taking had not yet occurred.

With the exception of the due process claim, the court did not hold that it lacked jurisdiction. As to Count I, the physical taking claim, the court's grant of summary judgment in favor of the Government constituted a judgment on the merits. *See Vink v. Hendrikus Johannes Schijf Rolkan N.V.*, 839 F.2d 676, 677 (Fed.Cir.1988) (a grant of summary judgment "is a decision on the merits with *res judicata* effect."). Plaintiff attempts to avoid this result by arguing that the court's decision was bound up in uncertainties regarding plaintiff's title to its easements and merely rejected allegations concerning the intrusion of water into the mine. The argument is incorrect.

The *Park City* court recognized that the United States contested plaintiff's title to the Fisher easements and the Gordon–Stott tunnel site, but it did not rely on those objections in denying plaintiff's taking claims:

> Both parties have devoted substantial portions of their briefing efforts to the question of whether plaintiff's tunneling rights-of-way are valid and enforceable. Indeed, the arguments defendant raises on this issue are not insubstantial. However, for purposes of ruling on the motions before us, we need not address the property ownership question.
>
> Like all federal courts, this court's jurisdiction is limited. Although our jurisdiction does extend to the resolution of the property ownership issues, that jurisdiction arises only in the context of bona fide taking claims. Otherwise, our jurisdiction does not reach disputes over title to real property, even where the United States is one of the parties to the dispute. Thus, in a case such as this one, in which plaintiff's taking claims obviously fail for lack of ripeness, it would be unwise for the court to address issues whose resolution can be seen from the start to be unnecessary to the outcome. For purposes of deciding the motions before us then, we will assume plaintiff holds title to the property interests it claims.

*Park City,* slip op. at 9–10 (citations omitted). The court's analysis of the physical taking claims thus cannot be viewed merely as a decision to withhold judgment on the merits until plaintiff's title to its operating easements was firmly established.

Nor did the prior holding reach only the specific claim that water seepage from the reservoir might take plaintiff's mineral deposits. The court specifically addressed, and rejected, what it referred to as plaintiff's "direct flooding claim." *See id.* at 14. The prior decision also addressed the hiking trail and utility easements. The *Park City* court referred to these contentions as being part of plaintiff's "access claim," *see id.* at 8, which it held did not state a valid takings claim.[2] *See id.* at 12–13.

The same analysis applies with respect to the alleged regulatory taking. The allegation is the same both here and in *Park City:* BOR and BLM's perceived unwillingness to permit any type of mining operation within the Jordanelle Reservoir's management boundary area. The evidence of this alleged intransigence has not changed. It is still the BOR's Final Supplement to the Final Environmental Statement for the Jordanelle Reservoir project, issued in 1987, and the BOR's 1993 letter rejecting plaintiff's request for compensation for the alleged diminution in value to its easements.

---

2. The court rejected plaintiff's argument that the presence of the utility and recreational trail easements constituted a *per se* taking. The court cited a declaration submitted by the BOR's Regional Director that "the technology exists to allow plaintiff's operation, the powerline, the natural gas pipeline, and the proposed bike and pedestrian trail to co-exist." *See id.* at 13, n. 9. The court also noted that the BOR's declaration said that "if shared usage of the easements did prove unworkable, then 'the utility easements and the proposed bike and pedestrian trail may be relocated.'" *See id.* at 13, n. 9. Due to plaintiff's failure to file a mining plan, a definite site had not been established for plaintiff's proposed access tunnel. *See id.* at 13. The court also found considerable uncertainty regarding the final location and effect of any power line, gas line, or recreational trail that might eventually be located on the Fisher property. *See id.* The convergence of these factors led the court to hold that "plaintiff has not demonstrated any physical interference with the property uses contemplated by its easements." *Id.*

Judge Wiese held that plaintiff's failure to file a mining plan with BOR was fatal to a regulatory takings claim:

Examined in light of the above-stated considerations, no conclusion can be reached on the present facts save that the submission of a mining plan would not amount to a pointless endeavor; hence, plaintiff's failure to do so cannot be excused. As a result, plaintiff's regulatory taking claim is premature.

See *Park City*, slip op. at 12. The court went on to dismiss for failure to state a claim. *See id.* at 20.

Plaintiff puts great emphasis, however, on the following conclusion in *Park City* as to the access claim:

Based on the discussion above, we reiterate our earlier conclusion: for lack of the filing of a mining plan, nothing more can now be said of plaintiff's taking claim save that the claim is premature.

*Id.* Plaintiff takes this statement to mean that the court was not reaching the merits of its claim, and was dismissing without prejudice. This is incorrect. The court held that the facts asserted did not constitute a taking. To the extent that a regulatory taking was alleged because of the Jordanelle Project, that taking had not yet occurred.

This reading is consistent with the Federal Circuit's decision in *Tabb Lakes, Ltd. v. United States*, 10 F.3d 796 (Fed.Cir.1993). In that case, the Federal Circuit upheld this court's decision granting summary judgment in favor of the government. *See id.* at 804. The plaintiff in *Tabb Lakes* had alleged a temporary taking resulting from an Army Corps of Engineers cease and desist order that halted its efforts to develop its property. This order remained in effect for several years, until it was struck down by the Fourth Circuit. *See id.* at 798–99. The plaintiff subsequently sought compensation for a temporary regulatory taking for the period during which development had been enjoined. *See id.* at 799.

In upholding this court's denial of plaintiff's claim in *Tabb Lakes*, the Federal Circuit found that the plaintiff could have taken steps to obtain a permit from the Corps that might have lifted the cease and desist order and permitted development to begin. The court held that plaintiff's failure to fully pursue this option precluded plaintiff from asserting that a taking had occurred during the time the cease and desist order was in effect. The court explained:

Tabb Lakes points to the testimony of its expert witness as creating an issue of fact which precludes summary judgment. Mr. Rist gave his opinion that there was no viable use [of plaintiff's land] until the cease and desist order was removed. However, Mr. Rist's testimony does not raise a genuine issue of material fact. As a matter of law, the possibility of a permit precludes the order itself from constituting a taking. Plaintiff was not precluded from development; it was precluded from development without a permit.

Thus, while the Constitution requires the payment of compensation for a taking for the period of time that a property has no economic value by reason of government regulation, the case law does not support plaintiff's view that a taking occurred on October 8, 1986 by reason of the Corps' demand that plaintiff obtain a permit before filling more wetlands. The testimony of a witness cannot change the law, as articulated by the Supreme Court, that the initiation of permit proceedings does not constitute a taking.

*Id.* at 801 (citations omitted). In short, dismissal for failure to pursue regulatory relief resulted in an adverse decision on the merits of *the claim then before the court.* Similarly, here, Judge Wiese's decision to dismiss for failure to obtain a ruling regarding a mining plan resulted in an decision on the merits of the claim then pending in *Park City*.

Residual has not alleged facts giving rise to any theory of taking other than those theories addressed in the earlier opinion. Nor has it directly challenged the unfavorable decision that resulted from the regulatory process following *Park City.* Instead, it merely has reasserted the same facts and circumstances that pre-existed the decision in *Park City*. This may have been precipitated by Residual's decision to let its interests in the Gordon–Stott tunnel site lapse, thus providing a solid basis for denial of a mining

plan. Whatever the reason, as became clear during oral argument, plaintiff's real grievance today is that Judge Wiese's decision was, as counsel put it, "erroneous." The test of that conviction, however, would have been through an appeal. There was no appeal, and Judge Wiese's decision as to the merits of the takings claims then before him thus became final.

Plaintiff is therefore barred from attempting to re-litigate the issue of whether a taking occurred based on actions taken by the government prior to the *Park City* decision.[3] Accordingly, the action is due to be dismissed.

## CONCLUSION

Plaintiff's motion for summary judgment is denied. Defendant's motion for summary judgment is granted. The Clerk is directed to dismiss plaintiff's claims with prejudice. Each party is to bear its own costs.

---

**3.** In an effort to avoid the preclusive effect of this holding, plaintiff insists that the dismissal of its regulatory taking claims was somehow jurisdictional in nature, and thus without prejudice. This argument, however, has been considered and expressly rejected by the Federal Circuit in *Do–Well Machine Shop*, where the court held:

> [T]he court must assume jurisdiction to decide whether the allegations state a cause of action on which the court can grant relief as well as to determine issues of fact arising in the controversy. Jurisdiction, therefore, is not defeated ... by the possibility that the averments might fail to state a cause of action on which petitioners could actually recover.

*Do–Well Machine Shop v. United States*, 870 F.2d 637, 639 (quoting *Bell v. Hood*, 327 U.S. 678, 682, 66 S.Ct. 773, 90 L.Ed. 939 (1946)).